1
2
3
4
5
6

# UNITED STATES DISTRICT COURT

7

## EASTERN DISTRICT OF CALIFORNIA

8

| | | |
|---|---|---|
| CLYDE HIXSON, | ) | 1:06cv0353 OWW DLB |
| | ) | |
| | ) | |
| Plaintiff, | ) | FINDINGS AND RECOMMENDATION |
| | ) | REGARDING SOCIAL SECURITY |
| v. | ) | COMPLAINT |
| | ) | |
| MICHAEL J. ASTRUE, Commissioner | ) | |
| of Social Security, | ) | |
| | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

9
10
11
12
13
14
15
16

17

## BACKGROUND

18    Plaintiff Clyde Hixson ("Plaintiff") seeks judicial review of a final decision of the

19    Commissioner of Social Security ("Commissioner") denying his application for disability

20    insurance benefits pursuant to Title II of the Social Security Act.  The matter is currently before

21    the Court on the parties' briefs, which were submitted, without oral argument, to the Magistrate

22    Judge for findings and recommendation to the District Court.

23    ## FACTS AND PRIOR PROCEEDINGS[1]

24    Plaintiff protectively filed his application on January 26, 2001, alleging disability since

25    June 20, 1998, due to injuries to his back, neck and leg.  AR 128-132, 140-149.  After being

26    denied both initially and upon reconsideration, Plaintiff requested a hearing before an

27    _____

28    [1] References to the Administrative Record will be designated as "AR," followed by the appropriate page
number.

Administrative Law Judge ("ALJ").  AR 90-93, 96-99, 100.  On September 11, 2002, ALJ James Berry held a hearing.  AR 538-581.  ALJ Berry issued a decision denying benefits on October 24, 2002.  AR 74-86.  On October 27, 2003, the Appeals Council vacated and remanded the action on the basis of new evidence.  AR 87-89.

ALJ Berry held a second hearing on July 29, 2004.  AR 582-611.  A supplemental hearing was held on November 3, 2004, but was continued.  On February 5, 2005, ALJ Berry heard testimony from a medical expert and vocational expert.  AR 623-642.  In a decision dated July 6, 2005, ALJ Berry denied benefits.  AR 15-31.  The Appeals Council denied review on January 26, 2006.  AR 9-12.

Hearing Testimony

*September 11, 2002 Hearing*

Plaintiff appeared with his attorney, Jeffrey Milam, at the first hearing held in Fresno, California, on September 11, 2002.  Vocational expert ("VE") Thomas Dachelet also appeared and testified.  AR 538.

Plaintiff was 53 years old at the time of the hearing and lived with his wife.  He has a driver's license but no longer drives because of numbness in his shoulders and arms and dizziness from the pain medication.  AR 542.  He completed the eighth grade and worked as a truck driver.  AR 543.  He had a Class A license, but cannot get it renewed because he can't pass the physical.  AR 543.  He stopped working on June 20, 1998, after he fell off the top of a trailer.  He subsequently settled a workers' compensation claim in 1999.  AR 544.

Plaintiff did not believe that he could work because he could not stand, walk, bend, stoop, twist or use his hands or arms for very long.  AR 546.  He has pain in his back and neck and his hands swell up and go to sleep.  AR 546.  His legs and feet tingle and go numb when he sits.  AR 547.  He falls asleep during the day because he doesn't sleep well at night and his medication makes him dizzy.  AR 547.

Plaintiff explained that the pain in his neck and back was constant and that the only time he didn't have the sensory problem in his feet and hands was when he was walking around or laying down.  He lays down for about five hours a day.  AR 548.  Plaintiff estimated that he

could stand for 15 minutes at a time and walk for 15 minutes at a time.  He could sit for about an hour and lift about 10 pounds.  AR 549.  During an eight hour day, he estimated that he spent four hours lying down, one hour on his feet and the rest sitting.  He could use his hands for 30 minutes for writing, etc. before needing to rest for 30 minutes.  AR 550.  He could grasp things with his hands for about two hours a day.  AR 551.

Plaintiff testified that he currently weighed 385 pounds, an increase of about 30 pounds in the past two years.  He had surgery on his knee, but it is still not okay although he isn't seeking treatment for it.  AR 552.  Doctors have told him he has to "live with" his back.  He takes pain medications and uses a moist heating pad and massagers.  He tried physical therapy but it made his back worse and his doctor told him to stop.  AR 553.  He uses a cane and a crutch that were prescribed when he had his knee surgery.  He has tried to lose weight but cannot because he is not active due to his injuries.  AR 554.

During a typical day, Plaintiff wakes up, takes his medication, and sits down for a while.  Then he'll get the garbage and set it onto the porch and maybe straighten up some of the dishes.  He lays down for an hour or so and then loads his pickup with garbage and drives it to the garbage bin.  AR 555.  He lives on a small ranch of about 20 acres.  AR 556.  In the afternoon, he doesn't do much, but might water the trees.  AR 556.  He also watches television for about four hours a day.  AR 557.  He doesn't fish or hunt anymore and doesn't go to church or social activities.  AR 557.

When questioned by ALJ Berry about a notation in October 1998 that he had gone back to work and was doing well, Plaintiff explained that he attempted to return to work after June 20, 1998, but was unable to do so after one day.  He thought he could stand for two hours and walk for two hours in an eight hour day.  AR 560.  He thought he could sit for about five hours.  AR 561.

Plaintiff realized that he was having problems with his hands about two or three months after the accident.  He was assigned a 30 percent disability rating.  AR 563.  He testified that the pain medication helps relieve the pain. AR 566.  His medications sometimes make him dizzy and nauseous.  AR 566.

1    Plaintiff testified that his 20 acres was empty except for a dog.  He does not mow it.  He

2  drinks about four mixed drinks every evening, but doesn't believe it interferes with his daily

3  activities.  AR 567-568.

4    For the first hypothetical, the ALJ asked VE Dachelet to assume a person of Plaintiff's

5  age, education and past work experience.  This person could lift and carry 20 pounds

6  occasionally, 10 pounds frequently, stand, walk and sit six to eight hours, and occasionally

7  balance, kneel, stoop, crouch, crawl, climb and push/pull.  This person cannot perform Plaintiff's

8  past work but could perform a significant number of light and sedentary positions.  AR 571-571.

9    For the second hypothetical, the ALJ asked the VE to assume that this person could sit for

10  two hours, and stand and walk for one-half hour.  This person could not perform any work.  AR

11  572.

12    *July 29, 2004 Hearing*

13    Based on the order of remand, ALJ Berry held a second hearing on July 29, 2004, in

14  Fresno, California.  Plaintiff appeared with his attorney, Jeffrey Milam.  VE Judith Najarian also

15  appeared and testified.  AR 582.

16    Plaintiff testified that since the last hearing, he was diagnosed with cancer and had his

17  kidney removed.  He did not undergo chemotherapy or radiation and there has been no recurrence

18  of cancer so far.  He goes back every three months for check ups.  AR 586.  His left shoulder,

19  neck, legs, knees and fingers have also worsened.  AR 587.  His hands are worse because he

20  can't grasp or hold anything without it slipping from his fingers.  AR 589.  He clarified that he

21  could hold a piece of paper and maybe a pencil and that his problems are with his left hand.  AR

22  591.  He has knots on his hands and is being treated for gout.  AR 592.  The numbness in his legs

23  has worsened.  AR 593.

24    Plaintiff estimated that he could stand for one to one and a half hours, walk about an hour

25  or less with breaks every five minutes, and lift and carry about 10 pounds or less.  He could sit

26  for about 20 minutes at a time, for a total of about an hour.  His medications help a little and

27  allow him to get through the day.  They cause lightheadedness, dizziness and sometimes nausea.

28

He still naps, occasionally takes out the garbage, watches television and visits relatives.  He no longer washes the dishes.  AR 596.  He stated that he never had a dog.  AR 597.

When questioned by his attorney, Plaintiff testified that he lays down for more than four hours a day now and it takes him five to ten minutes to brush his teeth.  AR 597.

VE Najarian testified that Plaintiff's past work as a truck driver was performed at the heavy level.  AR 604.

At the end of the hearing, ALJ Berry indicated that he was sending Plaintiff's records to a medical expert ("ME") to "delineate what was going on and when and why."  AR 604.  The ALJ allowed Plaintiff's attorney to submit interrogatories to the medical expert, as well.  Counsel requested that they have a supplemental hearing with the ME rather than interrogatories, and the ALJ indicated that he would do one or the other, depending on whether he could get an ME to attend a supplemental hearing.  AR 605.  He requested that counsel submit proposed interrogatories in case he could not find an ME to appear at a supplemental hearing, and counsel raised a formal objection, arguing that the ALJ was making him do extensive work despite knowing that he could get an ME to testify at a supplemental hearing.  AR 607.  Counsel and ALJ Berry then argued over counsel's allegation of bias and ALJ Berry indicated that the hearing was not the place to discuss such issues.  ALJ Berry refused to recuse himself.  AR 609-610.

*November 3, 2004 Hearing*

ALJ Berry held a hearing on November 3, 2004, with ME Joselyn Bailey, M.D., and VE Thomas Dachelet.  Plaintiff also appeared with his attorney, Jeffrey Milam.  AR 612.

Dr. Bailey appeared by telephone and indicated that she did not receive records, sent by the ALJ, of treatment subsequent to her answers to interrogatories.  ALJ Berry proposed continuing the hearing, but Mr. Milam indicated that he had no objection to proceeding without having her review the records because she agreed that there was disability since November 2002.  AR 616.  Counsel argued that there was no reason to further delay the case because the newer records merely confirm the treating physician's opinion.  AR 616.  ALJ Berry and Mr. Milam again argued over alleged bias, and counsel contended that he was denying Plaintiff due process

1  and/or inappropriately delaying the matter.  AR 618.  They also argued about an alleged

2  conversation that ALJ Berry had with Plaintiff outside the presence of counsel.  AR 618-621.

3  *February 2, 2005 Hearing*

4  At the last hearing, Plaintiff appeared with his attorney, Jeffrey Milam.  Dr. Bailey also

5  appeared and testified, as well as VE Dachelet.  AR 623.

6  Dr. Bailey testified that she was board certified in internal medicine and has appeared at

7  Social Security hearings for the past 15 years.  AR 626-627.  She reviewed the medical records

8  and opined that the positive bone scan in June 2004 indicated that the cancer had spread.  She

9  opined that his kidney cancer with spread to distant sites met Listing 13.21B.  She also opined

10  that the condition probably was present in August 2002.  AR 631.  As for the period prior to

11  August 2002, she did not have the records in front of her and could not offer an opinion.  AR

12  633-634.

13  For the first hypothetical, the ALJ asked the VE to assume an individual 52 to 55 years

14  old with Plaintiff's education and past relevant work experience.  This person can lift and carry

15  20 pounds occasionally and 10 pounds frequently.  This person can stand, walk and sit for six

16  hours each, and can occasionally stoop, crouch, kneel, crawl and balance.  This person cannot

17  perform Plaintiff's past work but could perform the entire world of unskilled light and sedentary

18  work.  AR 636.  Such jobs include packer, hand packer, production work, graders and sorters.

19  AR 636.

20  At the end of the hearing, Mr. Milam and ALJ Berry again argued over the treatment of

21  the case.  Mr. Milam requested ALJ Berry's bar number and also asked for an opportunity to

22  cross-examine Dr. Bailey with records for the period before August 8, 2002, especially as to

23  Exhibits 8F and 13F.  ALJ Berry refused to give Mr. Milam his bar number but invited him to

24  file a complaint.  AR 640.  Mr. Milam also requested that ALJ issue an immediate decision based

25  on the ME's suggestion that Plaintiff needed treatment for cancer that he was not receiving.  AR

26  641.

27  ///

28  ///

1    <u>Medical Evidence</u>

2         On July 21, 1998, Plaintiff presented to Francisco Alonso, M.D., for complaints of pain in

3    his neck and back after he fell between a truck and trailer at work.  On examination, he was

4    markedly obese and in mild distress.  His range of motion was limited due to pain.  Dr. Alonso

5    diagnosed acute cervical strain, acute lumbosacral strain and obesity.  AR 234.

6         On July 21, 1998, Plaintiff underwent x-rays of his cervical and lumbar spine.  The x-rays

7    revealed chronic mild degenerative disc change or disease with borderline to mild disc thinning

8    or narrowing of the lower cervical spine, and lumbar straightening with degenerative disc change

9    or disease of the lumbar spine with disc thinning or narrowing of the thoracolumbar junction and

10   lumbar spine.  AR 232.

11        Oscar P. Ansaldo, M.D., certified that Plaintiff was disabled from July 21, 1998, through

12   August 18, 1998.  AR 239.

13        Plaintiff began treatment with Mark Hellner, M.D., on August 17, 1998.  AR 317.  His

14   signs and symptoms were consistent with an aggravation of his underlying back problems.  He

15   recommended a course of physical therapy and Plaintiff was placed on disability from August 17,

16   1998, through September 22, 1998.  AR 298, 317.

17        Plaintiff underwent additional lumbar spine x-rays on October 13, 1998, that revealed

18   moderately severe degenerative changes of the lumbar spine and grade I spondylolisthesis.  AR

19   238.

20        On October 15, 1998, Plaintiff completed eight of twelve prescribed physical therapy

21   sessions.  He decided to terminate physical therapy due to his improved status.  Plaintiff

22   indicated that he had returned to work and was doing well.  AR 240.

23        On October 27, 1998, Dr. Hellner noted that physical therapy had been effective in

24   relieving his cervical pain, but not his lumbar pain.  AR 314.

25        Plaintiff underwent an MRI of his lumbar spine on November 3, 1998.  The test revealed

26   mild to moderate broad-based disc bulge at multiple levels, most prominent at L5-S1, no central

27   canal spinal stenosis, moderate neural foraminal stenosis at L5-S1 bilaterally, mild degenerative

28

1  disc disease at L4-5 and L5-S1, and minimal anterior displacement of the L5 vertebral body,

2  presumably on a degenerative basis.  AR 311.

3  _____Dr. Hellner indicated that Plaintiff was disabled from January 6, 1999, through March 23,

4  1999, due to cervical strain, lumbar strain and spinal stenosis.  AR 298.

5  _____Plaintiff saw Dr. Hellner on March 8, 1999.  Dr. Hellner indicated that Plaintiff had two

6  epidural steroid injections in February and March with virtually no relief.  AR 299, 302-306.

7  _____On March 22, 1999, Plaintiff saw John M. Emery, III, M.D., for a neurosurgical

8  consultation ordered by Plaintiff's workers' compensation carrier.  Plaintiff reported that he

9  returned to work for two days in September 1998 but could not tolerate it.  He complained of

10  radiating neck pain, radiating left shoulder pain, and a sharp pain and tingling in his lower back

11  and right buttock.  On examination, Plaintiff was morbidly obese at well over 350 pounds.

12  Straight leg raise was negative bilaterally and his sciatic nerves were nontender.  Dr. Emery

13  indicated that clinically, Plaintiff had no radiculopathy, myelopathy or cauda equina syndrome.

14  Dr. Emery had no explanation for his urinary symptoms.  Due to his size, Dr. Emery opined that

15  his best option would be a combination of physical therapy and weight reduction.  Dr. Emery

16  recommended an EMG and lumbar x-rays to rule out abnormal motion and a radiculopathy based

17  on the absent ankle jerk on the right.  AR 253-254.

18  _____Plaintiff saw Dr. Hellner on April 26, 1999.  He had limited mobility, marked positive

19  straight leg raising on the right at 70 degrees and on the left at 80 degrees, and limited motion in

20  the back with spasms and discomfort.  AR 290.

21  _____On May 26, 1999, Plaintiff saw William R. Stevens, M.D., at the Stanford University

22  Medical Center, for orthopedic evaluation of his lumbar pain.  After examination, Dr. Stevens

23  opined that Plaintiff continued to have low back pain symptoms, which were consistent with the

24  degenerative nature of his spine and were likely exacerbated by the accident.  He recommended a

25  weight loss program and physical therapy.  Dr. Stevens opined that Plaintiff was a good

26  candidate for job retraining for a job that requires less manual labor.  AR 255-256.  _____

27  _____On July 12, 1999, Dr. Hellner indicated that Plaintiff was permanent and stationary with a

28  permanent restriction to light duty, i.e., 50 pound absolute lifting, 25 pounds repetitive lifting,

and avoiding semi-prolonged or excessive bending, lifting, twisting or straining. He could begin

vocational rehabilitation any time. AR 287.

On July 14, 1999, Dr. Hellner opined that Plaintiff would benefit from a weight loss

program, use of non-narcotic analgesics, nonsteroidal anti-inflammatory medication, mild muscle

relaxers, occasional physical therapy and/or epidural injections, and a lumbosacral corset.

Surgery would not be needed due to his morbid obesity and the level of pathology in his back.

AR 286.

From July 20, 1999, through February 16, 2001, Dr. Hellner continued to indicate that

Plaintiff was limited to permanent light duty in his Attending Physician's Statements due to

cervical strain, lumbar strain and spinal stenosis. AR 259-285.

Dr. Hellner examined Plaintiff on August 30, 1999, and indicated that Plaintiff was

having subjectively worsening pain in his back that was not entirely alleviated by Ultram. His

straight leg raising was minimally positive, and he had spasm in the back and limited range of

motion. AR 280. Dr. Hellner suggested adding Vioxx. AR 280.

On June 2, 2001, Plaintiff underwent a consultive orthopedic examination performed by

Dan Mikol, M.D. Plaintiff was obese and deconditioned, and was in mild to moderate

discomfort at times. Gait was stiff but not obviously antalgic. Straight leg raising was negative

bilaterally. There was mild loss of lumbar lordosis with moderate lumbar spasms. There was

mild to moderate tenderness in many areas. He had normal bulk and tone, and 5/5 strength

throughout. Dr. Mikol diagnosed lumbar pain most likely due to underlying degenerative disc

disease/degenerative joint disease or possibly a herniated disc, and left upper back pain most

likely due to underlying myofascitis or bursitis. He also opined that his back pain could be due

to underlying osteoarthritis. AR 321-324.

Dr. Mikol opined that Plaintiff should be limited to lifting and carrying no more than 10

pounds on a sedentary to light basis, standing/walking no more than six hours per day on a light

basis, and sitting for six hours per day on a light basis. He was restricted in climbing, stooping,

pushing and pulling. Dr. Mikol indicated that Plaintiff's impairments were likely to persist,

although he would likely benefit from weight reduction. AR 324.

On June 19, 2001, State Agency physician Janice Thornburg, M.D., completed a Physical Residual Functional Capacity Assessment form. She opined that Plaintiff could lift 10 pounds occasionally and frequently, stand and/or walk for about six hours in an eight hour day, and sit for about six hours in an eight hour day. He could occasionally climb, balance, stoop, kneel, crouch and crawl. AR 325-332. These findings were reviewed and affirmed on September 18, 2001. AR 332.

An August 10, 2001, x-rays of Plaintiff's right foot revealed a small bone spur in his heel. AR 334-335.

Harish P. Porecha, M.D., examined Plaintiff on March 25, 2002. He was 380 pounds. Plaintiff had numbness in the bottoms of his feet and numbness and pain in his toes. He also had numbness in his hands and arms without pain. Dr. Porecha diagnosed peripheral neuropathy involving all four extremities distally, a cystic swelling in his neck, and possible sleep apnea. He recommended x-rays, an EMG and nerve studies and a sleep study. AR 359-361.

Electrophysiological testing performed on April 8, 2002, showed minimal evidence of slowing in the sensory nerves such as the sural nerve, but motor nerve conduction velocities were within normal limits. There was no evidence of any acute denervation in the left lower extremity. AR 362-363.

Plaintiff began seeing P.B. Iyer, M.D., on August 8, 2002, for complaints of severe left upper backache and/or chest pain. Dr. Iyer ordered blood tests, prescribed medication and recommended that Plaintiff undergo weight reduction surgery. AR 452.

Dr. Iyer completed a questionnaire on August 22, 2002. He opined that Plaintiff was disabled due to severe obesity, arthritis, sleep apnea, hypothyroidism and chest pain. He could sit for 30 minutes at one time and stand for 30 minutes at one time. Over an eight hour period, he could sit for less than two hours total and stand and/or walk for less than one to one and one-half hours. AR 383. He had to lie down for about two to three hours per day. AR 383.

On August 30, 2002, Dr. Porecha completed a questionnaire in which he opined that Plaintiff was disabled from performing work due to his neuropathy in all four limbs and probable sleep apnea. He based this on Plaintiff's obesity, deep tendon reflexes at only 1+, reduced

pinprick sensation in his right foot, and degenerative disc disease in his cervical spine.  Dr.
Porecha opined that Plaintiff could sit for two hours at one time and stand and/or walk for one-
half to one hour at a time.  He could sit for two hours total and stand and/or walk for one-half to
one hour total.  AR 382.

Plaintiff saw Dr. Iyer in October 2002 and complained of a history of abdominal pain.  A
recent sonogram was abnormal and Dr. Iyer recommended a CT scan.  AR 439, 444.

On January 9, 2003, an MRI of Plaintiff's abdomen revealed a mass in his left kidney that
was "highly suspicious for a malignant tumor."  AR 385.

On January 30, 2003, Mark Saleh, M.D., performed a left radical nephrectomy with no
complications for renal cell carcinoma, grade I.  AR 388-389, 395.

On February 13, 2003, Dr. Saleh noted that Plaintiff had a right adrenal mass and left
lung lesion that required follow-up.  AR 470.

Plaintiff saw Dr. Iyer on February 26, 2003, and complained of significant left hand
weakness and numbness.  Dr. Iyer referred Plaintiff for nerve conduction studies.  AR 438.

Plaintiff underwent an EMG on March 14, 2003.  The study was abnormal and was
suggestive of brachial plexopathy, especially involving the lower plexus and fibers going into the
ulnar nerve.  Gurpreet S. Dhaliwal, M.D., decided to watch Plaintiff conservatively for the next
few months and opined that he should improve with time and exercise.  He was instructed to
avoid any pressure on his elbow.  AR 435-436.

On June 6, 2003, a CT scan of Plaintiff's chest and abdomen revealed no suggestion of
metastatic disease.  AR 387.

On June 17, 2003, Dr. Saleh indicated that Plaintiff's right adrenal mass appeared benign
and his left lung lesion was possibly improved.  Dr. Saleh decided to continue with observation.
AR 472.

Plaintiff saw Dr. Iyer on December 2, 2003, for right knee pain.  His range of motion was
diminished, but there was no neurovascular deficit or tendon deficit.  Dr. Iyer diagnosed right
knee pain and medial meniscitis and prescribed medication.  AR 426.

In January 2004, Plaintiff was diagnosed with plantar fasciitis.  AR 425.

1    Plaintiff saw Dr. Iyer on May 3, 2004. He complained of significant backache and pain

2    going down the right hip, leg and knee. He had tenderness and paraspinal spasm on examination.

3    Dr. Iyer opined that it was unclear if anything else could be done for Plaintiff because of his

4    weight and suggested that he continue with his pain medications. AR 421.

5    On June 1, 2004, Plaintiff underwent a whole body scan to rule out osseous metastatis

6    disease. AR 414. There was a foci of increased radiotracer activity anteriorly in the right rib #3

7    or #4 and contiguous foci in the posterior aspect or costovertebral junction in the left ribs #7 and

8    #8 that was suspicious for osseous metastatis disease. The reviewing doctor suggested

9    correlation with conventional radiology or CT scan of the chest. AR 414.

10    Dr. Iyer completed another questionnaire on June 22, 2004. He opined that Plaintiff was

11    disabled due to severe obesity (over 425 pounds), possible heart disease, a herniated disc in his

12    neck, and a history of kidney cancer. Based on his examination and x-rays, Dr. Iyer opined that

13    Plaintiff could not perform any work. He could sit for less than one hour at a time and could

14    stand and/or walk for less than 30 minutes at one time. In an eight hour day, he could stand

15    and/or walk for less than two hours. He was unable to bend, stoop or sit for a prolonged period

16    of time. AR 403.

17    On June 30, 2004, Dr. Bailey completed interrogatories as a medical expert. Prior to

18    setting forth her opinion, she noted that medical records from 2003 and 2004 were needed for

19    more information about the probable cancer of the kidney and lung. His impairments included

20    kidney cancer, obesity and orthopedic problems in his back and foot. She opined that Listing

21    13.21(B) was met or equaled. She opined that he met the level of severity required by the Listing

22    on November 27, 2002, when a CT of his abdomen showed a large left renal mass. AR 453.

23    Prior to July 20, 1998, his major problems seemed to be morbid obesity, peptic ulcer disease,

24    possible kidney stones and hypertension. After his fall in July 1998, he continued to have low

25    back pain, much of which was attributable to his weight. AR 455-460.

26    On July 19, 2004, Plaintiff saw Dr. Iyer with complaints of excruciatingly severe pain in

27    his neck and left arm. Dr. Iyer recommended further testing. AR 517.

28



1    _____Plaintiff underwent a CT scan of his cervical spine on July 26, 2004.  The test revealed

2    degenerative disc disease from C2 through C7 but no osseous spinal stenosis.  An MRI scan was

3    recommended to further evaluate the possibility of disc herniation.  AR 453-454.

4    _____On August 23, 2004, Plaintiff returned to Dr. Saleh.  He reported that Plaintiff's right

5    adrenal mass and lung lesion had resolved and/or were benign.  AR 465.

6    _____On September 13, 2004, Plaintiff returned to Stanford University Medical Center

7    neurosurgical spine clinic for follow up on his neck and left arm pain.  He had no weakness or

8    radicular pain, but had some tingling in his feet.  His walking was okay.  An EMG done on

9    August 21, 2004, revealed a left ulnar neuropathy, but no abnormalities suggestive of acute

10   radiculopathy.  AR 505.  On examination, he had normal 5/5 strength in his upper extremities,

11   except for 3/5 in his left first dorsal interossei.  This was also associated with some atrophy in

12   that muscle.  He had decreased sensation and pinprick in his ulnar innervating the lateral aspect

13   of his left hand.  He had positive Tinel's at his left elbow.  His reflexes in his biceps, triceps, and

14   brachioradialis were 0 to 4 bilaterally.  Carl Spivak, M.D., opined that Plaintiff had incidental left

15   ulnar neuropathy, but noted that Plaintiff felt that this was minimally bothersome in comparison

16   to his neck, shoulder and left arm pain.  His EMG was negative and his CT scan was of poor

17   quality and undiagnostic, so Dr. Spivak could not localize the problem.  Dr. Spivak

18   recommended a CT myelogram.  AR 506.

19   _____Plaintiff continued to complain of significant neck pain in October 2004.  Dr. Iyer noted

20   tenderness and paraspinal spasms.  AR 504.

21   _____A February 2005, CT scan revealed pneumonia in Plaintiff's right lung.  AR 488.

22   _____On March 9, 2005, Dr. Iyer saw Plaintiff in follow-up for his pneumonia and indicated

23   that he was doing much better, with no complaints.  His echocardiogram was normal and they

24   discussed bariatric surgery.  AR 485.

25   _____An April 2005 prescription from Dr. Iyer revealed that Plaintiff was still being prescribed

26   Oxycontin.  AR 478.

27   ///

28   ///

1    ALJ's Findings

2    _____ ALJ Berry begins his decision with a review of the prior proceedings and discusses his

3    conflicts with Plaintiff's attorney, Mr. Milam.  AR 18-20.  After reviewing the medical evidence,

4    he determined that Plaintiff had the severe impairments of obesity, low back pain, cervical spine

5    degenerative disk disease, and a history of left-side renal carcinoma.  AR 21.  Despite Dr.

6    Bailey's testimony, ALJ Berry determined that the impairments did not meet or equal any

7    listings.  AR 2-23.  He further determined that Plaintiff was not credible.  AR 26.

8    Based on his review of the evidence, ALJ Berry found that Plaintiff retained the residual

9    functional capacity ("RFC") to perform a wide range of light work that precluded lifting and

10    carrying more than 20 pounds occasionally, 10 pounds frequently, standing, walking or sitting for

11    more than about six hours in an eight-hour day, and more than occasional stooping, kneeling,

12    crawling and balancing.  AR 28.  Although Plaintiff could not perform his past work, VE

13    Dachelet testified that he could perform unskilled light positions.  AR 28.

14    ## SCOPE OF REVIEW

15    Congress has provided a limited scope of judicial review of the Commissioner's decision

16    to deny benefits under the Act.  In reviewing findings of fact with respect to such determinations,

17    the Court must determine whether the decision of the Commissioner is supported by substantial

18    evidence.  42 U.S.C. 405 (g).  Substantial evidence means "more than a mere scintilla,"

19    *Richardson v. Perales*, 402 U.S. 389, 402 (1971), but less than a preponderance.  *Sorenson v.*

20    *Weinberger*, 514 F.2d 1112, 1119, n. 10 (9th Cir. 1975).  It is "such relevant evidence as a

21    reasonable mind might accept as adequate to support a conclusion."  *Richardson*, 402 U.S. at

22    401.  The record as a whole must be considered, weighing both the evidence that supports and

23    the evidence that detracts from the Commissioner's conclusion.  *Jones v. Heckler,* 760 F.2d 993,

24    995 (9th Cir. 1985).  In weighing the evidence and making findings, the Commissioner must

25    apply the proper legal standards.  *E.g.*, *Burkhart v. Bowen*, 856 F.2d 1335, 1338 (9th Cir. 1988).

26    This Court must uphold the Commissioner's determination that the claimant is not disabled if the

27    Secretary applied the proper legal standards, and if the Commissioner's findings are supported by

28

14

substantial evidence. *See Sanchez v. Sec'y of Health and Human Serv.*, 812 F.2d 509, 510 (9th Cir. 1987).

## REVIEW

In order to qualify for benefits, a claimant must establish that he is unable to engage in substantial gainful activity due to a medically determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than 12 months.  42 U.S.C. § 1382c (a)(3)(A).  A claimant must show that he has a physical or mental impairment of such severity that he is not only unable to do her previous work, but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy. *Quang Van Han v. Bowen*, 882 F.2d 1453, 1456 (9th Cir. 1989). The burden is on the claimant to establish disability. *Terry v. Sullivan*, 903 F.2d 1273, 1275 (9th Cir. 1990).

In an effort to achieve uniformity of decisions, the Commissioner has promulgated regulations which contain, inter alia, a five-step sequential disability evaluation process.  20 C.F.R. §§ 404.1520 (a)-(f), 416.920 (a)-(f) (1994).  Here, the ALJ determined that Plaintiff (1) had not engaged in substantial gainful activity since the alleged onset of disability;(2) has an impairment or a combination of impairments that is considered "severe" (obesity, low back pain, cervical spine degenerative disk disease, and a history of left-side renal carcinoma) based on the requirements in the Regulations (20 CFR §§ 416.920(b)); (3) does not have an impairment or combination of impairments which meets or equals one of the impairments set forth in Appendix 1, Subpart P, Regulations No. 4; (4) cannot perform his past relevant work; but (5) retains the RFC to perform a significant range of light work.  AR 29-31.

Here, Plaintiff argues that the ALJ (1) misapplied the Medical-Vocational Guidelines ("Grids"); (2) did not properly credit Dr. Porecha's opinion; (3) did not fairly review Plaintiff's testimony; (4) was biased; and (5) asked the VE an improper hypothetical question.

///

///

///

**DISCUSSION**

A.     Application of the Grids

‎        Plaintiff argues that the ALJ misapplied the Grids in the following ways: (1) by wrongly asserting that Plaintiff was under age 55 at the time of the decision; (2) by improperly rejecting Dr. Bailey's opinion; and (3) by failing to find that Plaintiff meet or equaled Listing 1.04.

*Plaintiff's Age*

Plaintiff contends that the ALJ improperly used Rule 202.11, which assumes that Plaintiff was under the age of 55 at the time of the decision.  As Plaintiff was 56 years old at the time of the decision in July 2005, he argues that the ALJ should have applied Rule 202.04.

A claimant's age is considered along with his RFC, education and work experience in making a disability determination.  20 C.F.R. § 404.1563(a).  Generally, where a claimant suffers only from exertional limitations, the ALJ may apply the Grids at step five to match the claimant with the appropriate work.  *Reddick v. Chater*, 157 F.3d 715, 729 (9th Cir. 1998).  The Grids are divided into three age categories:  "younger individuals" (age 18-49), "closely approaching advanced age" (age 50 to 54), and "advanced age" (age 55 and over).  The age categories are not to be applied "mechanically in a borderline situation."  20 C.F.R. § 404.1563(b); *Heckler v. Campbell*, 461 U.S. 458, 462 n. 5 (1983).  For example, if the claimant is a few months or a few days away from an age category that would result in a finding of disabled, the Commissioner will consider using the older age category.  *Id.*

 In his decision, the ALJ correctly noted that Plaintiff's date last insured was December 31, 2003, and that he had to prove disability before this date.  AR 20.  Therefore, Plaintiff's age as of the date last insured, rather than as of the date of the ALJ's decision, was the relevant age.  As of December 31, 2003, Plaintiff was 54 years old according to his birth date of April 5, 1949, and he was therefore about three months shy of his 55th birthday.

Pursuant to the language of 20 C.F.R. § 404.1563(b), Plaintiff was in a borderline situation since he was just three months away from his 55th birthday, and placing him in the

1   advanced age category would have resulted in a finding of disabled pursuant to Rule 202.02.[2]

2   The VE's testimony that Plaintiff could perform light work does not trump the Grids' finding.

3   *Swenson v. Sullivan,* 876 F.2d 683, 688 (9th Cir. 1989) (ALJ may not find from vocational

4   testimony that a claimant, deemed disabled under the grids, nonetheless could perform a

5   substantial number of jobs and not be disabled).

6          ALJ Berry therefore erred in failing to consider Plaintiff's borderline situation.  For the

7   reasons discussed at the end of this order, the Court finds that this action should be remanded for

8   payment of benefits.

9          *Dr. Bailey's Testimony*

10         Next, Plaintiff argues that the ALJ did not give proper weight to Dr. Bailey's opinion that

11   Plaintiff met Listing 13.21B as of August 8, 2002, when Plaintiff began complaining of severe

12   upper left back ache.  AR 631-632.

13         The listings of impairments describe impairments "that are considered severe enough to

14   prevent an adult from doing any gainful activity."  20 C.F.R. § 416.925(a).  Most of these

15   impairments are permanent or expected to result in death.  *Id.*  For all other impairments, the

16   evidence must show that the impairment has lasted or is expected to last for a continuous period

17   of at least 12 months.  *Id.*  If a claimant's impairment meets or equals a listed impairment, he or

18   she will be found disabled at step three without further inquiry.  20 C.F.R. § 416.920(d).

19         To demonstrate that an impairment matches a listed impairment, the claimant must show

20   that the impairment meets all of the medical criteria in a Listing.  *Sullivan v. Zebley*, 493 U.S.

21   521, 530 (1990).  "An impairment that manifests only some of those criteria, no matter how

22   severely, does not qualify."  *Id.*  To "equal" a listed impairment, a claimant must establish

23   symptoms, signs and laboratory findings "at least equal in severity and duration" to the

24   characteristics of a relevant listed impairment."  *Tackett v. Apfel*, 180 F.3d 1094, 1099 (9th Cir.

25   1999); 20 C.F.R. §§ 404.1526(a), 416.926(a).  Under the law of this circuit, "[i]t is unnecessary

26   to require the Secretary, as a matter of law, to state why a claimant failed to satisfy every

27

28         [2]  Plaintiff suggests that the ALJ should have used Rule 202.04, which addresses advanced age but applies
where the claimant is a high school graduate.  Here, Plaintiff has limited education as he only completed the eighth
grade.  AR 543.

1  different section of the listing of impairments." *Gonzales v. Sullivan*, 914 F.2d 1197, 1201 (9th

2  Cir.1990).

3      Here, Dr. Bailey testified that she reviewed the medical records and believed that the

4  positive bone scan in June 2004 indicated that his cancer had spread.  She opined that his kidney

5  cancer with spread to distant sites met Listing 13.21B.  She also opined that the condition

6  probably was present in August 2002.  AR 631.  Listing 13.21B requires evidence of kidney

7  carcinoma that has spread "to or beyond the regional lymph nodes."

8      Plaintiff argues that the evidence supports Dr. Bailey's finding and that the ALJ's logic

9  for rejecting the opinion was "unintelligible."  Opening Brief, at 14.  However, while a non-

10 examining physician's opinion can serve as substantial evidence in some circumstances, the ALJ

11 is entitled to reject it.  *See eg.*, *Tonapetyan v. Halter*, 242 F.3d 1144, 1149 (9th Cir. 2001).

12     In his opinion, ALJ Berry explained that although Dr. Bailey interpreted the records to

13 indicate that Plaintiff's cancer had spread to other parts of his body, she admitted that the records

14 did not contain any mention of further cancer treatment.  AR 631.  The MRI that identified the

15 tumor in January 2003 showed that it was contained, as did the pathology report following his

16 surgery.  AR 385, 523.  On June 6, 2003, a CT scan of Plaintiff's chest and abdomen revealed no

17 suggestion of metastatic disease.  AR 387.  Although Dr. Saleh had identified a right adrenal

18 mass and a mass in the left lung, Dr. Saleh concluded from follow-up tests that these

19 abnormalities were either benign or had cleared up.  AR 472.

20     Dr. Bailey based her opinion on the June 2004 bone scan revealed areas in Plaintiff's

21 chest that were  "suspicious for osseous metastatic disease" but recommended further testing for

22 definitive characterization.  AR 414.  When Plaintiff returned to Dr. Saleh in August 2004, he

23 reported that Plaintiff's right adrenal mass and lung lesion had resolved and/or were benign.  AR

24 465.  The ALJ further cites Plaintiff's July 2004, testimony that no additional cancer has been

25 detected so far, and that he did not require any treatment other than removal of his kidney.  AR

26 24, 586.

27     In concluding his analysis, the ALJ explained that based on his review of the evidence,

28 the great weight of the objective medical evidence was inconsistent with Dr. Bailey's opinion.

Indeed, the report of a non-examining, non-treating physician should be discounted and is not

substantial evidence when contradicted by all other evidence in the record. *Gallant v. Heckler*,

753 F.2d 1450, 1454 (9th Cir.1984).  Although Plaintiff states that in 2004, "additional scanning

revealed metastatic disease, which required surgery in January 2004," and that Plaintiff was

"treated post-operatively without any additional developments," there are no records of

additional surgery in January 2004.  This is consistent with Plaintiff's testimony in which he

stated that other than the January 2003, surgery to remove his kidney, there has been no

recurrence of cancer.[3]  AR 586.

Insofar as Plaintiff contends that the ALJ refused to note that the Listing was met for at

least a year, his argument fails.  Plaintiff first began complaining of pain in August 2002 and

underwent surgery in January 2003 without complications.  The ALJ was reasonable in

concluding that the evidence showed that Plaintiff's surgery was successful in treating his cancer

and that, based on the above evidence, there was no recurrence and therefore no disability lasting

for 12 months or longer.

*Listing 1.04*

Plaintiff further argues that the ALJ should have found that Listing 1.04 was met or

equaled.  Listing 1.04 deals with disorders of the spine and requires one of the following:

> (A) Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine); or

> (B) Spinal arachnoiditis, confirmed by an operative note or pathology report of tissue biopsy, or by appropriate medically acceptable imaging, manifested by severe burning or painful dysesthesia, resulting in the need for changes in position or posture more than once every 2 hours; or

> (C) Lumbar spinal stenosis resulting in pseudoclaudication, established by findings on appropriate medically acceptable imaging, manifested by chronic nonradicular pain and weakness, and resulting in inability to ambulate effectively, as defined in 1.00B2b.

As previously discussed, a claimant bears the burden of establishing disability under the

Listings. *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990).  Plaintiff cites evidence demonstrating

---

[3] The Court also notes that on February 7, 2005, ALJ Berry wrote a letter to Dr. Saleh inquiring as to any evidence of metastases.  AR 126.  He did not receive a response.  ALJ Berry also subpoenaed records from Dr. Saleh, Dr. Iyer and Dr. Porecha in April 2005, but did not receive responses.  AR 221-228.

that he suffers from obesity, degenerative lumbar and cervical disc disease, cervical

radiculopathy, lumbar stenosis, lumbar spondylolithesis, thoracic herniations, and brachial

plexopathy in the left upper extremity.  He also cites conditions in other parts of his body.  While

Plaintiff may in fact suffer from these impairments, it does not necessarily mean that he meets or

equals a Listing.  To do so, a claimant must show that the impairment(s) meets all of the listed

criteria.  Here, there is no evidence of nerve root compression or spinal arachnoiditis.  Nor does

the evidence support a finding of "lumbar spinal stenosis. . . resulting in an inability to ambulate

effectively..."  While Plaintiff undisputably has a back impairment and there is some evidence of

spinal stenosis, the ALJ's finding that Plaintiff was not disabled at step three was supported by

substantial evidence.  Although Plaintiff had limited range of motion during a few examinations

and seemed to be in obvious pain, the evidence does not necessarily support a finding that his

impairment rises to the level of "chronic nonradicular pain and weakness" that "result[s] in

inability to ambulate effectively."  The ALJ is responsible for resolving conflicts in the medical

evidence.  *Magallanes v. Bowen*, 881 F.2d 747, 750 (9th Cir. 1989).  Indeed, the Court must

uphold the ALJ's decision where the evidence is susceptible to more than one rational

interpretation.  *Id.*

Plaintiff also suggests that his obesity significantly contributes to the level of impairment

and further supports his argument that the ALJ should have found that Listing 1.04 was met or

equaled.  Plaintiff is correct that the evidence suggests that his obesity contributed to his back

impairment, but that doesn't change the fact that he does not meet the listing criteria, even

considering his obesity.  "As obesity is not a separately listed impairment, a claimant will be

deemed to meet the requirements if 'there is an impairment that, in combination with obesity,

meets the requirements of a listing.'" pursuant to SSR 02-01p.  *Burch v. Barnhart*, 400 F.3d 676,

682 (9th Cir. 2005).  Similarly, equivalence may be determined "if a claimant has multiple

impairments, including obesity, none of which meets the listing requirement, but which when

viewed in the aggregate are equivalent to a listed impairment."  *Id.*  As explained above, the

ALJ's determination at step three was supported by substantial evidence and Plaintiff's obesity

does not alter this result.

1    B.      Treating Physicians' Opinions

2           Next, Plaintiff argues that the ALJ did not properly review Dr. Porecha's opinion that he

3    could not perform full time work due to the combination of his impairments.  He cites Dr.

4    Porecha's August 30, 2002, questionnaire in which he opined that Plaintiff was disabled from

5    performing work due to neuropathy in all four limbs and probable sleep apnea.

6           The opinions of treating doctors should be given more weight than the opinions of

7    doctors who do not treat the claimant.  *Reddick v. Chater*, 157 F.3d 715, 725 (9th Cir.1998);

8    *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir.1995).  Where the treating doctor's opinion is not

9    contradicted by another doctor, it may be rejected only for "clear and convincing" reasons

10   supported by substantial evidence in the record.  *Lester*, 81 F.3d at 830.  Even if the treating

11   doctor's opinion is contradicted by another doctor, the ALJ may not reject this opinion without

12   providing "specific and legitimate reasons" supported by substantial evidence in the record.  *Id.*

13   (quoting *Murray v. Heckler*, 722 F.2d 499, 502 (9th Cir.1983)).  This can be done by setting out

14   a detailed and thorough summary of the facts and conflicting clinical evidence, stating his

15   interpretation thereof, and making findings.  *Magallanes  v. Bowen*, 881 F.2d 747, 751 (9th

16   Cir.1989).  The ALJ must do more than offer his conclusions.  He must set forth his own

17   interpretations and explain why they, rather than the doctors', are correct.  *Embrey v. Bowen*, 849

18   F.2d 418, 421-22 (9th Cir.1988).

19          The ALJ's July 2005, decision was made after the Appeals Council vacated the October

20   2002, decision based on new and substantial evidence of Plaintiff's cancer.  AR 88.  In the order,

21   the Appeals Council stated that the ALJ should update the medical records and "re-evaluate the

22   claimant's condition" and should determine "whether the claimant's complaints of back pain  are

23   related to the renal mass, and if so, . . .  establish an onset of disability."  AR 88.  The ALJ was

24   specifically instructed to:

25          Update the medical record and give consideration to the treating source opinions pursuant
            to the provisions of 20 C.F.R. § 404.1527 and Social Security Rulings 96-2p and 96-5p,
26          and explain the weight given to such opinion evidence.

27   AR 89.

28

In his subsequent decision,  the ALJ incorporates by reference his findings relating to Plaintiff's impairments, other than his cancer, made in the prior October 2002 decision.  AR 21, 22, 27.  For example, he incorporates his prior finding that Plaintiff had the severe impairments of obesity, low back pain and cervical spine degenerative disc disease, explaining that "[t]here is nothing in the current record to indicate that those findings were in error."  AR 21.  He also incorporates his prior finding that these impairments did not meet or equal the criteria of any listing.  AR 22.  The ALJ then goes on to summarize the new evidence and finds his history of left-side renal carcinoma to be an additional severe impairment.  AR 22.

Similarly, in his treatment of Dr. Porecha's August 30, 2002, opinion, and Dr. Iyer's August 22, 2002, and June 22, 2004, opinions, the ALJ states:

> Two physicians that treated the claimant provided assessments of the claimant's ability to perform work activity that were deferential to the claimant and supportive of his application for disability  (Exhibits 13F, 14F and 18F).  The October 24, 2002, Administrative Law Judge decision contains an adequate discussion of my reasons for considering and rejecting those opinions (Exhibit 3A, pp. 4-13).  That analysis is incorporated by reference and made part of this decision.

AR 27.

In addition to arguing that the ALJ improperly rejected these opinions, Plaintiff also believes that the ALJ erred by maintaining that his prior rationale was sufficient.[4]  Prior to determining whether the opinions were properly rejected, the Court finds that ALJ did not properly re-evaluate the evidence pursuant to the Appeals Council's instructions on remand. Specifically, the Appeals Council instructed the ALJ to re-evaluate Plaintiff's condition, including the relationship between his back pain and his subsequent cancer, and consider treating source opinions and explain the weight given to such opinion evidence, yet the ALJ's recent decision contains no such analysis.  AR 89.  Instead, the ALJ simply refers to his prior analysis and considers his cancer as an independent impairment.  This was error.  When a claimant suffers from multiple impairments, the Commissioner must consider their combined effect without regard to whether any such impairment, if considered separately, would be of sufficient medical severity, in determining whether the claimant is disabled.  *Gregory v. Bowen*, 844 F.2d 664, 666

---

[4] While Defendant submits his argument as to the ALJ's treatment of the treating physicians' opinions, he does not address Plaintiff's contention that the ALJ should have reviewed the opinions de novo.

(9th Cir.1988), *Sprague v. Bowen*, 812 F.2d 1226, 1231 (9th Cir. 1987).  While Plaintiff's back impairment may not have been related to his cancer, or exacerbated by it, the ALJ should have at least discussed the possibility, pursuant to the law and as instructed by the Appeals Council, and explained the rational for his conclusion.

In this regard, then, the ALJ also should have re-evaluated the prior treating physician's opinions within the context of his cancer and examined his overall condition.  By incorporating his prior findings by reference, the ALJ failed to do so.  As the ALJ did not provide a proper analysis of the treating physicians' opinion in his current decision, the Court will not review the analysis in his October 2002 decision.

C.   Plaintiff's Credibility

Plaintiff contends that the ALJ did not fully and fairly review his testimony.  He argues that his good earnings record was ignored along with other "complaints which the ALJ did not want to rebut."  Opening Brief, at 17.  He also contends that the ALJ misrepresented the truth.

The ALJ is required to make specific findings assessing the credibility of plaintiff's subjective complaints.  *Cequerra v. Secretary of HHS*, 933 F.2d 735 (9th Cir. 1991).  "An ALJ is not 'required to believe every allegation of disabling pain' or other non-exertional impairment," *Orn v. Astrue*, ___F.3d___, 2007 WL 2034287, *9 (9th Cir. 2007) (citation omitted).  In rejecting the complainant's testimony, "the ALJ must identify what testimony is not credible and what evidence undermines the claimant's complaints."  *Lester v. Chater,* 81 F.3d 821, 834 (9th Cir. 1996) (quoting *Varney v. Secretary of Health and Human Services,* 846 F.2d 581, 584 (9th Cir. 1988)).  Pursuant to Ninth Circuit law, if the ALJ finds that the claimant's testimony as to the severity of her pain and impairments is unreliable, the ALJ must make a credibility determination with findings sufficiently specific to permit the court to conclude that the ALJ did not arbitrarily discredit claimant's testimony.  *Thomas v. Barnhart,* 278 F.3d 947, 958 (9th Cir. 2002).

"The ALJ may consider at least the following factors when weighing the claimant's credibility: '[claimant's] reputation for truthfulness, inconsistencies either in [claimant's] testimony or between [her] testimony and [her] conduct, [claimant's] daily activities, [her] work record, and testimony from physicians and third parties concerning the nature, severity, and effect

of the symptoms of which [claimant] complains." *Id.* (citing *Light v. Soc. Sec. Admin.,* 119 F.3d 789, 792 (9th Cir. 1997). "If the ALJ's credibility finding is supported by substantial evidence in the record, we may not engage in second-guessing." *Id.*

In his evaluation of Plaintiff's credibility, the ALJ first stated that Plaintiff "portrayed himself as being much more limited than is reasonably supported by the objective medical evidence in the record." AR 25. He then went through numerous statements that Plaintiff made and rebutted them with medical evidence. He stated,

> The claimant alleged in his testimony that he has great difficulty using his hands and that he has no grip strength. He testified that he felt he could hold a piece of paper and pencil and that he could use his right hand to sign his name, but alleged that he has even greater problems using his left hand. The claimant alleged in his testimony that, over an eight-hour workday, he could stand no more than 60 to 90 minutes and sit or walk no more than 60 minutes. He also alleged he could lift and carry no more than ten pounds at a time.

AR 25.

He then reviewed an EMG from April 2002 and an EMG from August 2004, and used the results to support his determination that the "objective findings indicat[e] the claimant has an abnormality in only his left upper extremity." The ALJ continued,

> His right upper extremity has repeatedly been normal. Even the abnormal muscle group in the left upper extremity is still functional, although somewhat weaker than the surrounding muscle groups. Therefore, the claimant's portrayal of himself as only being able to lift up to ten pounds and handle a piece of paper and a pencil are gross exaggerations and exceed the limitations reasonably supportable by the objective findings concerning the abnormalities in his upper extremities.

AR 26.

Addressing Plaintiff's allegation that the ALJ misrepresented his testimony, the Court agrees with Plaintiff's argument. First and foremost, the ALJ's demeanor during his questioning of Plaintiff was more adversarial than neutral. Take the following exchange, for example:

| | |
|---|---|
| ALJ: | Okay. Do you recall before whether there was an involvement of your hands - let me rephrase. How is your - how are your hands worse now than they were before if you can tell us in words? |
| Plaintiff: | Because I haven't - I have no power. I can't grasp nothing or hold nothing or, you know, do anything. Like I can't even hold a glass, you know, hardly without it slipping from my fingers, you know. |
| ALJ: | Okay. Now, I got two different answers in that same sentence. First you said you could hold nothing, and then you said you could hold a glass - |
| Plaintiff: | I said, I can't even hardly hold a glass. |

24

| | | |
|---|---|---|
| 1 | ALJ: | The first thing I understood you say is you can't hold anything? |
| 2 | Plaintiff: | Right. |
| 3 | ALJ: | You can hold nothing? |
| 4 | Plaintiff: | Right.  Yes. |
| 5 | ALJ: | You can't grasp nothing? |
| 6 | Plaintiff: | Right.  Yes. |
| 7 | ALJ: | Nothing is meant as absolutely nothing - no thing.  If you're - if we're taking that literally.  So I need you to please try to explain what you mean by nothing? |
| 9 | Plaintiff: | Well, what I mean by nothing, there's a - |
| 10 | ALJ: | Can you hold a piece of paper? |
| 11 | Plaintiff: | Yes.  I can hold a piece of paper.  Yes - |
| 12 | ALJ: | That's something. |
| 13 | Plaintiff: | Yes. |
| 14 | ALJ: | - please?  Now what can you hold? |
| 15 | Plaintiff: | I can hold a piece of paper, you know, or maybe a pencil or something but -yeah - |
| 16 | ALJ: | Okay.  Now, you signed your name with a pen.  Is that correct? |
| 17 | Plaintiff: | Right.  With the other hand. |
| 18 | ALJ: | Explain? |
| 19 | Plaintiff: | The left hand is one that I have the real bad problem, and I sign with my right. |

AR 589-591.

Plaintiff soon after testifies that he can use his right hand for maybe 15 minutes a time for activities such as writing or typing, before needing a 20 minute rest.  AR 592.  He did not believe he could do that throughout an eight hour day.  AR 592.  In rejecting his testimony, the ALJ calls Plaintiff's allegation that he can handle a piece of paper and a pencil a "gross exaggeration," yet it was the ALJ who put these words into his mouth by asking, "Can you hold a piece of paper?"  AR 590.  As Plaintiff contends, the ALJ ignores Plaintiff's later testimony that he could so do for about 15 minutes a time, information that gives Plaintiff's prior testimony more context.  Instead

of analyzing Plaintiff's testimony as a whole, the ALJ selectively chose portions of Plaintiff's statements to support his credibility finding.  This is unacceptable, and, given the discussion below regarding Plaintiff's claims of bias, not surprising.

The ALJ's reliance on the EMGs to support his credibility finding is also flawed.  While the ALJ cites the 2002 and 2004 EMGs, which were certainly not benign, he ignores other objective evidence.  In March 2002, Dr. Porecha noted that deep tendon reflexes were only 1+ symmetrically.  He had numbness in his hands, arms, and bottoms of his feet.  His fingertips felt dead and asleep.  His pinprick sensation was reduced in his right foot and he could "barely feel in the hands."  Dr. Porecha opined that Plaintiff had peripheral neuropathy involving all four extremities distally and recommended testing. AR 360.  In March 2003, Plaintiff underwent another EMG that the ALJ failed to discuss in his credibility analysis.  The study was abnormal and was suggestive of brachial plexopathy, especially involving the lower plexus and fibers going into the ulnar nerve.  AR 435.  Moreover, although the ALJ dismisses the August 2004 EMG as indicating "evidence of only a left ulnar neuropathy" and showing no "evidence of acute cervical spine radiculpoathy," he was not entitled to use his own interpretation of such findings to dismiss Plaintiff's allegations.  The ALJ is not allowed to use his own medical judgment in lieu of that of a medical expert. *Gonzalez Perez v. Sec'y Health & Human Serv.*, 812 F.2d 747, 749 ("The ALJ may not substitute his own layman's opinion for the findings and opinion of a physician.")

Apart from the ALJ's selective recitation of the medical records and his own interpretation thereof, the ALJ cites one other factor in support of his decision to find Plaintiff not credible.  He stated that during the hearing held prior to the October 2002, decision, Plaintiff alleged that he lived on a 20 acre parcel, but that he did not have any plants or animals on the property other than his dog. AR 26.  However, Plaintiff "admitted to one of his treating physicians that he attended to a small ranch with some helpers to maintain the ranch."  AR 26.

Indeed, Dr. Porecha noted in March 2002 that Plaintiff "attends to a small ranch with helpers to maintain the ranch."  AR 359.  During his September 2002 testimony, Plaintiff stated that his 20 acres was empty except for a dog and that children or grandchildren mow it and Clark

Pest Control sprays the weeds.  AR 567-568.  The ALJ contrasts these two statements and infers that Plaintiff is somehow being untruthful and inconsistent.  Yet calling these two statements inconsistent is quite a stretch.  In March 2002, Plaintiff stated that he uses helpers to maintain the ranch and then consistently testified six months later that his grandchildren or children mow the lawn and Clark Pest Control sprays the weeds.  That the ALJ thought that this was a strong enough distinction from which to infer that Plaintiff was a liar is both surprising and disappointing.

The ALJ's credibility analysis is neither supported by substantial evidence nor free of legal error.

D.   ALJ's Bias

The crux of Plaintiff's complaint is that ALJ Berry was biased against him and that this bias resulted in actual prejudice against him.  For the reasons discussed below, the Court agrees and further suggests that ALJ Berry's bias is the likely catalyst behind his otherwise untenable findings discussed above.

Prior to discussing the merits of this claim, some background is helpful.  Mr. Milam and his office have made numerous claims of bias against ALJ Berry in past actions.  Prior to this claim, though, the allegations were supported mainly with statistical data, i.e., ALJ Berry's low approval rate compared with the national average.  The Court continually found that such information was irrelevant to the particular case and was therefore insufficient to find bias.  To the extent that counsel previously attempted to provide case-specific information, the Court found that the information was not enough to overcome the presumption that ALJ Berry was unbiased.  For the reasons explained below, though, counsel has now provided the Court with sufficient information to unequivocally find that ALJ Berry was biased against Mr. Milam and that such bias prevented him from providing Plaintiff with a fair and partial proceeding.[5]

When faced with a claim of bias, the Court must start with the presumption that administrative adjudicators are unbiased and that they exercise their decision-making authority

_____

[5] Interestingly, Defendant does not respond to *any* of the allegations of bias or specific examples of questionable behavior identified by Plaintiff.  Rather, Defendant rebuts the bias argument with simply stating that ALJ Berry's "decision was properly grounded in the administrative record and should be upheld."  Opposition, at 14.

with honesty and integrity.  *See Schneider v. McClure*, 456 U.S. 188, 195-196 (1982); *Withrow v. Larkin*, 421 U.S. 35, 47 (1975).  This presumption can be rebutted by a showing of a conflict of interest or by showing some other specific reason for disqualification.  *Schneider*, 456 U.S. at 195.  The burden of overcoming this presumption rests with the Plaintiff.  *Id.* at 196.

This action has a rather long and convoluted history, most of which has been detailed at the beginning of this opinion.  After his initial denial was vacated by the Appeals Council, ALJ Berry held three additional hearings, one of which was continued three months to allow the ME to review records she had not received.  The numerous delays were met with objections by Plaintiff's counsel, who repeatedly pleaded with the ALJ for a prompt decision given the unknown state of Plaintiff's cancer.  The Court cannot say with certainty that these delays were motivated solely by ALJ Berry's obvious hostility.  However, these delays, combined with the unsupportable findings as discussed above and the specific examples of his behavior below, demonstrate that, without a doubt, that ALJ Berry's behavior was so "extreme as to display clear inability to render fair judgment."  *Rollins v. Massanari*, 261 F.3d 853, 858 (9th Cir. 2001).

Mr. Milam and ALJ Berry have a history of failing to peacefully coexist.  In this action, their acerbic relationship surfaced as early as Plaintiff's first hearing in September 2002.  During Mr. Milam's closing statement, he often found himself defending his statements against ALJ Berry's interpretations.  AR 575-576.  He also found himself subject to interruptions such as this:

|   |   |
|---|---|
| Mr. Milam: | So if you review the questionnaire, you will see that the doctor says that he is inferring from the evidence that it was before then.  The objective evidence confirms disability back to, we submit, the time that he - |
| ALJ Berry: | Not what you submit.  What's in the record. |

AR 577.  ALJ Berry was surely aware that Mr. Milam was *arguing* on behalf of his client, but nonetheless needed to antagonistically insert himself.  The two continued to spar:

|   |   |
|---|---|
| Mr. Milam: | Well, we've got the doctor saying he's totally temporarily disabled basically up through that date, and there isn't a full exam on that date.  And if you're putting - if you're considering that the primary basis to deny, you know, I - |
| ALJ Berry: | I'm not considering - I'm just considering - all I'm doing, Mr. Milam, is considering all of the evidence and bring[ing] to light certain things that |

|   |   |   |
|---|---|---|
| | | I'm looking at in the decision from his treating physician.  You were giving me arguments, which you felt support your position. |
| Mr. Milam: | | Yes, your honor. |
| ALJ Berry: | | All right.  I just offered different evidence from a different perspective and bring it to light.  I have not made a decision as to - |
| Mr. Milam: | | Well, it sounds as though that this is - you know- |
| ALJ Berry: | | No.  It doesn't sound like anything.  That's your interpretation.  All I'm telling you is, you made an argument that the evidence shows that your client [is] less than sedentary.  He should be disabled under these rules.  I asked you to make an argument as to why you felt that way.  You did.  Then I asked you also, how do you reconcile different evidence or evidence which does not show exactly that, and which, in some instances I think, contradicts your conclusion.  That's all it was. |
| Mr. Milam: | | Okay. |
| ALJ Berry: | | Simply all it was.  Intellectual exercise.  Okay?  Anything else? |

AR 579-580.

At the July 2004 hearing, their sparring continued.  ALJ Berry indicated that he was going to send the records to an ME to "delineate what was going on and when and why."  AR 604.  ALJ Berry asked Mr. Milam to submit interrogatories, and Mr. Milam requested a supplemental hearing with the ME rather than interrogatories.  AR 605.  ALJ Berry indicated that he would try and get a supplemental hearing, but would use interrogatories if he could not do so, and that Mr. Milam should submit interrogatories to cover the contingency.  AR 606.  Mr. Milam objected to having to do unnecessary work and the two began to argue:

|   |   |   |
|---|---|---|
| Mr. Milam: | | . . .That's requiring me to do something, and for the record, you're waiving your arms up.  You're making frowns. |
| ALJ Berry: | | Yes.  I am. |
| Mr. Milam: | | In the courtroom. . . |
| | | . . . We would ask for a formal objection, Your Honor. |
| ALJ Berry: | | Fine, Mr. Milam. |
| Mr. Milam: | | And the objection will be that if you ask for - I know that ME's are available, number one, and if you ask for one, we will have it here with one.  If on the other hand for some reason you can't get one, then we would note the proper objections at that time me for the claimant - |
| ALJ Berry: | | You're welcome to it. |

29

1    Mr. Milam:      - and -

2    ALJ Berry:      You're welcome to it. . .

3                    . . . Fine.  Your objections have been noted and you're being redundant.  I
                     want the -

4

5    Mr. Milam:      I don't think I'm being redundant.

     ALJ Berry:      Fine.  Fine.
6
     Mr. Milam:      You can say that, it doesn't make it true.
7
     ALJ Berry:      Mr. Milam, I expressed my desire to have the questions.  Sir, it's your
8                    option to submit them or not.  In event -

9    Mr. Milam:      We will not submit them, Your Honor -

10   ALJ Berry:      Okay.  Okay.

11   Mr. Milam:      - because this is the bias -

12   ALJ Berry:      Okay.

13   Mr. Milam:      - that forms an impossible relationship between me and you.

14   ALJ Berry:      I'm not even going to get into that discussion, Mr. Milam.

15   Mr. Milam:      Okay.  That's - for the record -

16   ALJ Berry:      About -

17   Mr. Milam:      - we again note an objection to having this hearing.  This is consistent with
                     the type of -
18
     ALJ Berry:      Objection to having what hearing are you talking about?
19
     Mr. Milam:      For you being the Judge and not removing yourself, you know -
20
     ALJ Berry:      Well, that's - I - this is not the place to talk about that.  This is not the
21                   place -

22   Mr. Milam:      Well, I don't know where it is.

23   ALJ Berry:      Excuse me.  Are you finished with  - you finished with the issues
                     concerning this particular case, because I'm not going to talk about any of
24                   your allegations about bias.

25   Mr. Milam:      Okay.  We just would request recusal, unbiased for this individual case.

26   ALJ Berry:      Okay.  I have noted your oral request -

27   Mr. Milam:      That's fine.

28   ALJ Berry:      - and I refuse to recuse myself.  Thank you.  Anything else concerning this
                     case?

| | | |
|---|---|---|
| Plaintiff: | No. Nothing else, sir. | |

Mr. Milam:   What would you have to say, sir, after all this? Be honest.

Plaintiff:   Well, I think that I deserve a - to a - have, you know, I think I deserve it. If anybody does, you know.

AR 607-610.

At the November 2004, hearing, Dr. Bailey did not testify because she indicated that she did not receive certain records. ALJ Berry decided to continue the hearing to allow her to review the records, which included records for treatment received after she completed her interrogatories. Mr. Milam indicated that he did not object to proceeding without the records since Dr. Bailey agreed that disability existed since November 2002, and because the case has already been delayed. Mr. Milam indicated that the missing records only confirm prior records. AR 616. He further requested that ALJ Berry ask Dr. Bailey if she could testified later that day, after reviewing records, to avoid further delay. AR 617. ALJ Berry refused, explaining that he wanted her to have "adequate time" to review the documents and because he thought it would be "a reach" to ask a practicing physician to be available later that day. AR 617. Mr. Milam again objected and argued that the case should not be delayed because of an "error on the part of the Court in getting records to the medical expert." AR 618. Mr. Milam also brought up an off-the-record conversation that ALJ Berry had with Plaintiff. AR 618.

Mr. Milam:   And, Your Honor, I just think that again this morning is inappropriate because this should have - and your facial gestures now, which my client will see, are disrespectful -

ALJ Berry:   I don't -

Mr. Milam:   They are - you're making faces at me while I speak.

ALJ Berry:   Yes, I am. I am reacting to what you are saying, and I am not a monolith, and I don't hear things and I don't look at things without making facial expressions. I - that's it. I don't know anybody that does. Okay? If you have a problem with that, that's your problem. Now, finish your argument, please?

Mr. Milam:   So, we - for- I'm sure it will not be heard. You've already denied the motion before I made it because you hung up -

ALJ Berry:   No, it's -

Mr. Milam:   So we would move that this case be done, the records could be faxed, and it could be done today, Your Honor.

31

1    AR 619.  ALJ Berry denied the request to ask Dr. Bailey if she would be available that afternoon

2    and then moved on to discuss his conversation with Plaintiff outside the presence of counsel.

3    ALJ Berry:     . . . The last time you were here, [I] called Mr. Hixson in here.  Asked him
                     had he seen you.  He said, yes.  You walked by him.  Said, [inaudible] you
4                    will be back or something.  I said, do you know if he's coming back.  He
                     said, I don't know.  I brought him in here and asked you where he was.  I
5                    said, okay.  He's not here.  Go call him.  Go and call him.  Did not ask him
                     if he wanted a hearing without you or anything of that type.  Is that true or
6                    not true, Mr. Hixson?

7    Plaintiff:     No.  It's not true, Your Honor.

8    ALJ Berry:     I asked you, did you want a hearing?

9    Plaintiff:     You asked me - you said, do you want to proceed with your attorney here
                    or not.  And you said those words and it should be on the record, and I
10                  swear -

11   ALJ Berry:     And what was your response?

12   Plaintiff:     I said, well, I don't know.  I don't - you know, I said I don't think so, you
                    know.  I don't know.  And you says, well, I'll give you five minutes to go
13                  call him, and that's the exact words you gave me - you told me.

14   ALJ Berry:     Then that is me coercing you to have a hearing without your attorney?
                    That's your interpretation?
15
     Plaintiff:     You asked me if I want to proceed without him.
16
     ALJ Berry:     And when you hesitated and you said you didn't know, did I say anything
17                  else but go call him?

18   Plaintiff:     No.  I said, I don't know.  And then I - and you said well think about it for
                    a second or whatever, and I - I said, well, I don't.  And you said, well, I'll
19                  have you five minutes to go call him.

20   ALJ Berry:     Okay.  That's your interpretation.  Okay. . .

21   AR 620-621.

22        The follow-up hearing with Dr. Bailey took place in February 2005, about three months

23   after the above exchange.  During Mr. Milam's closing arguments, the following exchange took

24   place:

25   Mr. Milam:     . . . Number two, you cited a - several exhibits that you gave to that doctor.
                    You left our 8F and 13 F.  8F are records from the claimant from one of
26                  the neurologists by your own list of exhibits, and Dr. Peresha's [phonetic]
                    opinion, a neurologist wasn't sent.  Number three, she never got exhibits
27                  1F through 16F, so she could not even give an opinion about -

28   ALJ Berry:     She - excuse me, Mr. Milam.  I think you're mischaracterizing what she
                    said.  She said she didn't have them in front of her.  I sent the documents

                                        32

with the interrogatories.  She responded to the interrogatories.  Do you want me to read the page.  It's a document she had.

Mr. Milam:     Okay.  She did not have them with her then.

ALJ Berry:     Why don't you say that?

Mr. Milam:     Okay.  I -

ALJ Berry:     You said, I didn't send them.

Mr. Milam:     Okay.

ALJ Berry:     You're accusing me of something here again.

Mr. Milam:     She said she didn't have them with her.  Right?

ALJ Berry:     No.  You said I didn't send them.

Mr. Milam:     Okay.  Your Honor, I'm trying -

ALJ Berry:     Why don't you do this.  Why don't you be a little bit more careful with your selection of words?  I'd appreciate it.

Mr. Milam:     I would try to.  There's a great deal of upset over this case as you well know, and you can make faces at me, which everybody can see for the record.  And -

ALJ Berry:     My -

Mr. Milam:     This -

ALJ Berry:     My - excuse me.  My expressions are my expressions.  When you come in here, this is what you get.  If you don't like my expressions, that's your personal problem.  It is not mine.

Mr. Milam:     There's a judicial conduct involved, Your Honor.

ALJ Berry:     I've never seen one for facial expressions.  That's all I have to say about it. So, continue on what you have to say, Mr. Milam.

Mr. Milam:     We would like a copy of the tape that is not -

ALJ Berry:     You can copy anything that you -

Mr. Milam:     It's not in the file -

ALJ Berry:     You can copy anything that you like. . .

Mr. Milam:     For the claimant, I would like your bar license number so that for him and other people we can take appropriate action for this claim and others. There will be challenges as a result of this case and others, Your Honor.

ALJ Berry:     Okay. . .

               . . . First of all, I'm not going to give you my bar license number.  If you

want to file a complaint, file one. Please do. Excuse me- file another one if you would.

Mr. Milam:    I haven't filed one, sir. . .

. . . And we note objecting again to your ability to immediate[ly] act on a significant case. Two people died waiting for final decisions of your denials last year - within this last year. This gentleman, according to your medical expert, said that he needs treatment that he's not receiving for cancer.

ALJ Berry:    I didn't hear that.

Mr. Milam:    Well -

AR 637-641.

While the above recitations are somewhat lengthy, they are necessary to demonstrate the overall relationship between Mr. Milam and ALJ Berry and its impact on this action. As Mr. Milam stated earlier, it is an impossible relationship. In fact, they are barely civil to each other at best, and outright insolent, at worst. It is inconceivable to this Court why ALJ Berry did not recuse himself based on history alone to avoid the appearance of prejudice. ALJ Berry showed himself to be obstinate when faced with repeated requests to recuse himself, even amidst the deteriorating semblance of neutrality. In his decision, he explained his reasoning as follows:

Mr. Milam views my every action and word through the filter of his own animosity towards me. He attributes thoughts and actions to me that exist only in his own mind, not in reality. I conclude his allegation of my misconduct is unsupported by any evidence and completely devoid of merit. Therefore, his request that I recuse myself from hearing this case was not granted.

AR 19.

Despite ALJ Berry's belief that Mr. Milam is imagining things, the record demonstrates otherwise. Therefore, given the overall record, including specific exchanges between ALJ Berry and Mr. Milam and Plaintiff, the Court finds that ALJ Berry was biased against Plaintiff and was unable to render a fair judgment. *See Rollins*, 261 F.3d at 858 (while "expressions of impatience, dissatisfaction, annoyance, and even anger, that are within the bounds of what imperfect men and women ... sometimes display" and do not establish bias, a claimant can overcome the presumption against bias by showing that "the ALJ's behavior, in the context of the whole case, was so extreme as to display clear inability to render fair judgment.")

///

1    E.      Vocational Expert Testimony

2          Finally, Plaintiff contends that the hypothetical question posed to the VE was vague and

3    inconsistent with the evidence.  Specifically, Plaintiff argues that the ALJ failed to apply the

4    changed age group, failed to specify whether Plaintiff could do more than six hours of standing

5    or sitting, and failed to include all postural limitations.

6          "Hypothetical questions posed to the vocational expert must set out all the limitations and

7    restrictions of the particular claimant . . . ."  *Embrey v. Bowen*, 849 F.2d 418, 422 (9th Cir.1988).

8    The testimony of a VE "is valuable only to the extent that it is supported by medical evidence."

9    *Sample v. Schweiker*, 694 F.2d 639, 644 (9th Cir. 1982).  The VE's opinion about a claimant's

10   residual functional capacity has no evidentiary value if the assumptions in the hypothetical are

11   not supported by the record.  *Embrey*, 849 F.2d at 422.

12         The hypothetical posed to the VE included the following assumptions:  an individual 52

13   to 55 years old with Plaintiff's education and past relevant work experience, the ability to lift and

14   carry 20 pounds occasionally and 10 pounds frequently; the ability to stand, walk and sit for six

15   hours each; and the ability to occasionally stoop, crouch, kneel, crawl and balance.  VE Dachelet

16   responded that this person could not perform Plaintiff's past work but could perform the entire

17   world of unskilled light and sedentary work.  AR 636.  In reliance on this answer and on the

18   Grids, the ALJ found that Plaintiff could perform a wide range of light work.  AR 28.

19          Because the Court concluded above that the ALJ failed to examine whether the advanced

20   age category should have been used and failed to properly assess the treating physicians'

21   opinions, the hypothetical posed to the ALJ was likewise improper.

22   F.      Remand

23         Section 405(g) of Title 42 of the United States Code provides: "the court shall have the

24   power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying,

25   or reversing the decision of the Secretary, with or without remanding the cause for a rehearing."

26   In social security cases, the decision to remand to the Commissioner for further proceedings or

27   simply to award benefits is within the discretion of the court.  *McAllister v. Sullivan*, 888 F.2d

28   599, 603 (9th Cir. 1989).  "If additional proceedings can remedy defects in the original

administrative proceedings, a social security case should be remanded.  Where, however, a rehearing would simply delay receipt of benefits, reversal and an award of benefits is appropriate."  *Id.* (citation omitted); *see also Varney v. Secretary of Health & Human Serv.*, 859 F.2d 1396, 1399 (9th Cir.1988) ("Generally, we direct the award of benefits in cases where no useful purpose would be served by further administrative proceedings, or where the record has been thoroughly developed.").

The record before this Court is replete with errors, many of which seem motivated by ALJ Berry's obvious bias.  Had such bias not existed, it is likely that he would have exercised his discretion to place Plaintiff in the advanced age category, which would have resulted in a finding of disabled**.**  20 C.F.R. § 404.1563(b).  Although such considerations are generally left to the discretion of the ALJ, the circumstances warrant a finding that Plaintiff should have been placed in the advanced age category and found disabled pursuant to Rule 202.02.  Accordingly, the action should be REMANDED FOR PAYMENT OF BENEFITS.

In the future, ALJ Berry should seriously consider recusing himself from claims involving Mr. Milam to avoid the appearance of bias.

## **RECOMMENDATION**

Based on the foregoing, the Court finds that the ALJ's decision is not supported by substantial evidence and is not based on proper legal standards.   Accordingly, the Court RECOMMENDS that Plaintiff's appeal from the administrative decision of the Commissioner of Social Security be GRANTED and that JUDGMENT be entered for Plaintiff Clyde Hixson and against Defendant Michael J. Astrue.  The Court further recommends that the action be REMANDED FOR PAYMENT OF BENEFITS.

These findings and recommendations will be submitted to the Honorable Oliver W. Wanger, pursuant to the provisions of Title 28 U.S.C. § 636(b)(l).  Within fifteen (15) days after being served with these findings and recommendations, the parties may file written objections with the court.  The document should be captioned "Objections to Magistrate Judge's Findings

and Recommendations."  The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order.  <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

IT IS SO ORDERED.

**Dated:** ___**September 14, 2007**___              ___**/s/ Dennis L. Beck**___
                                                          UNITED STATES MAGISTRATE JUDGE